IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

M J NICHOLS COMPANY, INC.,
and MICHAEL J. NICHOLS,

                         Plaintiffs,

   v.

CRAIG THOMPSON, in his
Official Capacity as Secretary of the
Wisconsin Department of
Transportation,

                         Defendant.

OPINION and ORDER

24-cv-566-amb

---

      Plaintiff Michael J. Nichols is a Wisconsin resident and self-described car enthusiast who, through his plaintiff company, has acquired many vehicles over the years. Nichols has a long history of expressing himself through personalized vehicle registration plates, also known as vanity license plates, which the Wisconsin Department of Transportation makes available through an application and review process. In 2019, plaintiffs' application for a plate reading "RD RRAGE" was denied and placed on a list of objectionable proposed plates that the Department maintains. Wisconsin's statutory scheme permits the Department to deny proposed personalized plate text that "may carry connotations offensive to good taste or decency, or which would be misleading, or in conflict with the issuance of any other registration plates." Wis. Stat. § 341.145(7). After their "RD RRAGE" application was denied, plaintiffs sued defendant Craig Thompson, Secretary of the Wisconsin Department of Transportation, alleging that this statutory language facially violates the Free Speech clause of the First Amendment by permitting viewpoint discrimination.

The parties have filed cross motions for summary judgment and have fully briefed the issue. For the reasons below, the court finds that the text forming the registration numbers of Wisconsin's personalized registration plates is government speech. Consequently, the court GRANTS defendant's motion and DENIES plaintiffs'.

## JURISDICTION

The parties have consented to jurisdiction by a United States Magistrate Judge. Dkt. 10. The court has original jurisdiction over plaintiffs' claim because it arises under the Constitution of the United States. 28 U.S.C. § 1331.

## FACTUAL FINDINGS[1]

### A. Wisconsin's license plates

Wisconsin drivers must register their motor vehicles with the state before operating them on Wisconsin's public highways. Wis. Stat. § 341.04(1)(am). Once a vehicle is successfully registered, the Department of Motor Vehicles ("the Department") issues two registration plates, commonly referred to as license plates, which must be displayed and visible when the car is operated on public roads. *Id.* at §§ 341.12(1) & 341.15. By default, Wisconsin license plates bear a random combination of six letters and numbers that comprise the

---

[1] The only dispute the parties raised in their proposed findings of fact was to defendant's reference to the language of certain Wisconsin statutes, which plaintiffs challenged as legal conclusions, not facts. *See, e.g.*, Dkt. 28 at 4. Defendant replied that the law speaks for itself and is undisputed. *Id.* These objections and replies are noted but do not affect the court's factual findings, analysis, or resolution.

registration number assigned to the vehicle. *Id.* at § 341.12(3)(a). There were 6,296,450 registered vehicles in Wisconsin in 2024. Dkt. 20-1 at 93.

In 1905, Wisconsin began issuing plates that were good for the life of the vehicle. Dkt. 26-6 at 2. Starting in 1909, vehicles were required to re-register every year. *Id.* Beginning in the 1910s, license plates bore either a "W" or "Wis." to link them to the State of Wisconsin. *Id.* at 2–3. In 1932, the word "WISCONSIN" first appeared, *id.* at 5, and in 1940, "AMERICA'S DAIRYLAND" was added, *id.* at 6. In 1946, plates were printed with a number representing the month the plate expired. *Id.* at 7.

Today, Wisconsin plates continue to bear "AMERICA'S DAIRYLAND" in addition graphics of a red barn, trees, a sailboat, and birds, which symbolize Wisconsin's agriculture industry, woodlands, popular recreation, and wildlife, respectively. *Id.* at 9. Wisconsin plates may also include specific letters to convey certain information, such as "F" for farm vehicles, "B" for buses, and "RV" for recreational vehicle trailers. *Id.*; *see also* Dkt. 26-1.

**B. Current personalized plate program**

Since 1979, Wisconsin law has permitted residents to apply for personalized registration plates. Wis. Stat. § 431.145. Under the current statutory scheme, vehicle owners may propose a combination of between one and seven alphanumeric characters of their choosing to be that vehicle's registration number, which is displayed on their license plate in lieu of the default random combination of six characters. *Id.* The statute states that the requested plates shall be issued only if the application and fees are submitted timely and the proposed combination of characters has not already been issued. *Id.*

The statute also permits the Department to refuse to issue any proposed plate with a combination of characters that "may carry connotations offensive to good taste or decency, or

which would be misleading, or in conflict with the issuance of any other registration plates."

*Id.* at § 341.145(7). The Department has guidelines listing criteria it may consider objectionable:

1. Profanity in any language, read forward, backwards or upside down.
2. Message denoting violence directed toward someone or something.
3. Sexual terms/acts/body parts/sexually related bodily functions or fluids.
4. Derogatory reference to a group or individual based on age, race, nationality, ethnicity, gender, or religion or a group that promotes racial superiority:
    a. White Supremacist/Nazi references. (For example, the numbers 14 and 88 when used together, the letters SS with other German word or war references).
    b. Racial or ethnic slur
5. Reference to illegal substances or criminal acts/organizations:
    a. Reference to Gangs, marijuana
6. Identifying as law enforcement or other government organization:
    a. P0LICE, BADC0P
7. Messages may not be difficult to distinguish:
    a. MWMWMWM
    b. XKKXXKX
    c. B8B8B8B
    d. XYXYXYX
    e. 888888U
8. Messages may not conflict with the issuance of any other registration plates.

Dkt. 26-4. The Department's decision whether to issue a personalized plate is final and not subject to judicial review. Wis. Stat. § 341.145(7). Additionally, the Department may cancel and order the return of any personalized plate that the Department retrospectively deems in conflict with their guidelines. *Id.* at § 341.145(8).

To apply for a personalized plate, applicants complete and submit a form issued by the Department and pay the requisite fees. Dkt. 26-2. A trained Department staff member reviews the application and determines whether the proposed text is objectionable under the Department's guidelines. Dkt. 26 at 3. If the proposed text is deemed not objectionable and the other registration requirements are met, the staff member processes the application and issues the plates. *Id.* at 4.

4

If the proposed text is deemed objectionable, the staff member puts a hold on the application and fills out a form email with information about the requested plate. *Id.* The completed email is sent to a team of Department employees from the Department's Title and Registration Processing Section ("TARPS"), which reviews potentially objectional text and determines whether it meets the Department's criteria for issuance. *Id.* Relying on internal guidelines, the TARPS team votes on whether to approve the requested plate. *Id.* at 4–5. If the TARPS team votes to deny a plate, the plate is not issued, and the proposed text is added to a list that the TARPS team maintains. *Id.* at 5. The TARPS Section Chief or a higher-ranking Department manager can review the TARPS team's decision to deny the plate upon a written customer complaint or an internal request for review. *Id.*

In Wisconsin in 2024, there were 6,296,450 registered vehicles, 239,413 issued personalized plates, and 29,496 personalized plate applications. Dkt. 20-1 at 84–85, 93. Of the 29,496 applications, 1,166 were flagged for additional review and 694 were ultimately denied. Dkt. 26 at ¶¶ 38 & 39.

## C. The Department's denial of plaintiffs' application

Plaintiff Nichols is a self-described car enthusiast who, through his plaintiff company M J Nichols Company, Inc., owns several vehicles. Dkt. 19 at 2. Nichols has a long history of obtaining personalized plates for every vehicle he owns, which he uses to express his personality and make political statements. *Id.*

The story of the plate at issue in this case begins almost twenty-five years ago. In 2001, plaintiffs obtained a personalized plate reading "RD RRAGE," which adorned his Pontiac Firebird Trans Am until sometime in 2003 when he surrendered the car as part of an unrelated legal action. *Id.* In 2019, plaintiffs acquired another Trans Am and again applied for a plate

5

that read "RD RRAGE" to match the car he surrendered in 2003. *Id.* at 2–3. This time, however, the Department denied plaintiffs' application for the "RD RRAGE" license plate despite having previously issued it in 2001. *Id.* at 3. Plaintiffs would later learn that the Department added "RD RRAGE" to its list of objectionable license plates in June 2019 following its denial of his application. *Id.* Believing the denial of the application was a mistake, plaintiffs filed another application for the same personalized plate in December 2023. *Id.* The Department denied the application again and informed plaintiffs that the requested plate was "not available." *Id.*

In August 2024, plaintiffs filed this suit, alleging that the statutory language permitting the Department to deny or revoke personalized plates that "may carry connotations offensive to good taste or decency" facially violates the First Amendment by restricting the applicant's personal expression. Dkt. 1 at 8. Plaintiffs do not allege any other claims.

The parties filed cross motions for summary judgment. Dkts. 17 & 22. The issue has been fully briefed and is ripe for judgment.

## LEGAL STANDARDS

Summary judgment is appropriate when there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether there are genuine factual disputes, the court examines the record in the light most favorable to the party opposing judgment and construes all reasonable inferences from the evidence in their favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). Mere conclusory

allegations do not constitute evidence.  *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003).  Disputed facts that are not outcome-determinative are not material and will not preclude summary judgment.  *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir.1997).

## DISCUSSION AND ANALYSIS

The parties' motions raise a threshold question—who speaks through the text displayed on a personalized registration plate?  If the applicant, plaintiffs' challenge to Wisconsin's statutory scheme is protected by the First Amendment and subject to Free Speech forum analysis because "the government does not have a free hand to regulate private speech on government property." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).  If the government, however, then the Free Speech Clause is inapplicable because the First Amendment does not bar the government from censoring its own speech.  *Id.* at 467–68.  The parties largely agree on the law that applies to this question but disagree on how it should resolve the case.  It is a close call, as illustrated by the split developing at the district court level, made all the more difficult because there is no clear guidance in this Circuit.  On the whole, the court finds defendant has the better argument and concludes that the registration number displayed on personalized license plates constitutes government speech.

A. **Government vs. private speech precedent**

Determining the identity of the speaker can be difficult when a message is expressed through a joint venture of private citizens and governmental bodies, as is the case with Wisconsin's personalized license plates.  The Supreme Court has offered guidance for resolving this inquiry in four recent cases, discussed below in chronological order.

7

In *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), the Court determined whether the government or a private party spoke through monuments created by private citizens but approved by the city and permanently exhibited in a public park. The court focused on three factors: (1) whether governments have historically used monuments to speak to the public, *id.* at 470, (2) the general public's perception of who speaks through monuments displayed on public property, *id.* at 471, and (3) whether the government maintains control over the selection of monuments, *id.* at 473. The Court concluded that the expression at issue was government speech, and, in so doing, expressly rejected the notion that the involvement of private parties in designing the monuments was sufficient to override the other considerations. *See id.* at 470–71.

The Court further developed *Summum*'s three-factor framework in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015). That case involved Texas's specialty license plate program, which permitted private nonprofit entities to propose license plate designs with unique slogans or graphics. *Id.* at 205. This specialty plate program was distinct from a personalized plate program like the one considered here. In fact, the *Walker* court expressly proscribed personalized plates from its analysis. *Id.* at 204.

Per Texas's specialty plate program, the Texas Department of Motor Vehicles Board could either approve a submitted design and make it available for cars registered in Texas or reject it for various reasons. *Id.* at 205. The plaintiff claimed that the Board perpetrated impermissible viewpoint discrimination after it rejected plaintiff's submitted design for a specialty license plate bearing the Confederate flag. *Id.* at 206. Applying the same factors as they did in *Summum*, the Court concluded that messages conveyed by specialty plates were

government speech despite the necessary and obvious involvement of private parties in designing and submitting potential slogans or graphics.

First, just like monuments in public parks, the Court noted the long history of states conveying messages through license plates to promote tourism, tout local industry, or urge action towards a goal. *Id.* at 211. Second, the Court reasoned that license plate designs are "often closely identified in the public mind with the [State]." *Id.* at 212 (quoting *Summum*). The Court focused on the intrinsic, obvious "governmental nature" of license plates, describing them as "essentially [] government IDs" whose messages are "routinely—and reasonably— interpreted as conveying some message on the issuer's behalf." *Id.* (quoting *Summum*) (cleaned up). The Court noted that the State of Texas was solely responsible for issuing its license plates, displayed "TEXAS" in large letters on the top of every license plate, and dictated the rules of their disposal. *Id.* Also, the State of Texas owned the designs on its plates, including specialty ones. *Id.* Third, the Court found that the state controlled the messages conveyed by specialty plates by possessing final approval authority over proposed designs and exercising it by rejecting at least a dozen proposed designs. *Id.* at 213. For those reasons, the Court concluded that specialty plates conveyed government speech.

Two years later in *Matal v. Tam*, 582 U.S. 218 (2017), the Court contrasted the issuance of specialty license plates under Texas law with the Patent and Trademark Office's ("PTO") registration of trademarks under the Lanham Act, holding that messages conveyed by registered trademarks are private speech. First, the Court explained that trademarks have not traditionally been used to convey governmental messages and that trademarks, unlike license plates, are recognized at common law and are enforceable even if not registered with the PTO. *Id.* at 224– 25. Further, the Court distinguished the objective, "content-neutral" trademark registration

9

process under the Lanham Act from Texas's final authority over its specialty plate program to illustrate the relative lack of control the PTO exercises over trademarks and their messages. *Id.* at 235. Regarding public perception of the speaker, the Court noted "there is no evidence that the public associates the contents of trademarks with the Federal Government," *id.* at 238, and further speculated that "it is unlikely that more than a tiny fraction of the public has any idea what federal registration of a trademark means," *id.* at 237. "In sum," the Court concluded, "the federal registration of trademarks is vastly different from the . . . monuments in *Summum*, and even the specialty license plates in *Walker*." *Id.* at 239.

Finally, in *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243 (2022), the Court analyzed whether flags flown by private parties on the plaza in front of Boston City Hall as part of an official city flag-raising program was government speech. The Court reflected on the competing analyses in *Walker* and *Tam* and held that messages conveyed by the flags chosen and flown by private parties were private speech. *Id.* at 259. The third *Walker* factor was central to the Court's holding. Boston exercised virtually no oversight or control over the design or messages conveyed by the private parties' flags. *Id.* at 256–57. In fact, the city had no guidelines about what flags could be flown, and the city official in charge of approving applications did not even look at the flags the private parties planned to fly ahead of the event. *Id.* at 257. As such, the flag raising program was more analogous to the content-neutral, objective requirements of the PTO's registry in *Tam* than to either the *Summum* monuments or *Walker* specialty plate program, which were subject to diligent governmental review and approval. *Id.*

A few courts have applied this jurisprudence to the personalized license plate programs of various states, and the resulting opinions are split. Some courts have found that the text on

10

personalized plates is private speech. *See Overington v. Fisher*, 733 F. Supp. 3d 339, 343 (D. Del. May 14, 2024); *Carroll v. Craddock*, 494 F. Supp. 3d 158, 161 (D.R.I. Oct. 2, 2020); *Ogilvie v. Gordon*, 540 F. Supp. 3d 920, 926 (N.D. Cal. Nov. 24, 2020); *Hart v. Thomas*, 422 F. Supp. 3d 1227 (E.D. Ky. Nov. 13, 2019); *Mitchell v. Maryland Motor Vehicle Admin.*, 450 Md. 282, (Oct. 28, 2016), *as corrected on reconsideration* (Dec. 6, 2016). Others have found the text government speech. *See Gilliam v. Gerregano*, No. M2022-0083-SC-R11-CV, 2025 WL 617603 (Tenn. Feb. 26, 2025); *Odquina v. City & Cnty. of Honolulu*, No. 22-CV-407-DKW-RT, 2022 WL 16715714 (D. Haw. Nov. 4, 2022); *Comm'r of Indiana Bureau of Motor Vehicles v. Vawter*, 45 N.E.3d 1200 (Ind. Nov. 6, 2015). The court is unaware of any court in the Seventh Circuit having ruled on the issue.[2]

B. Analysis

1. Standing

Before turning to the merits, the court first addresses standing. Plaintiffs challenge the facial constitutionality of two subsections of Wis. Stat. § 341.145—subsection (7), which permits the Department to deny personalized plate applications, and subsection (8), which permits the Department to cancel and order the return of any issued personalized plates that the Department determines, in hindsight, carry connotations offensive to good taste and

---

[2] The Seventh Circuit did consider a First Amendment challenge involving Illinois' specialty license plate program in *Choose Life Illinois, Inc. v. White*, 547 F.3d 853 (7th Cir. 2008). The court held that the specialty license plates did not constitute government speech, that the plates constituted a nonpublic forum, and the exclusion of the plate at issue was a permissible and reasonable content-based restriction. While the issues considered in *Choose Life* are adjacent to those raised here, the opinion predates *Summum* and *Walker*, and the test applied to determine government or private speech was slightly different than the one prescribed in those opinions. In light of this, the court considered *Choose Life* as a part of the overall legal landscape but ultimately relied on *Summum* and its progeny for the operative law.

11

decency, or which may be misleading. There is no question that plaintiffs have standing to challenge subsection (7). So, the court can and will engage with the constitutional question raised, if only against subsection (7). But there is a wrinkle involving subsection (8). Defendant argues that plaintiffs lack standing to challenge subsection (8) specifically because they have not demonstrated a concrete, particularized, and actual or imminent injury of having a plate revoked. Dkt. 23 at 36.

"Standing analysis centers on whether the plaintiff has suffered or is likely to suffer an 'injury in fact.'" *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (citation omitted). To establish standing, the plaintiff's injury must satisfy three fundamental requirements: an injury that (1) is concrete and particularized, (2) was or will be caused by the defendant, and (3) likely will be remedied by a favorable judgment. *Id.* "Future injuries must be 'imminent, not "conjectural" or "hypothetical."'" *Id.* (citation omitted). A party facing the threat of an unconstitutional law does not need to expose themself to liability before challenging its constitutionality if the threatened enforcement is sufficiently imminent, *id.* (internal quotations omitted), but mere "[a]llegations of *possible* future injury are not sufficient," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations and citation omitted; emphasis in original).

Plaintiffs argue that the threat posed by § 341.145(8) "operates now, chilling [their] speech," and amounts to a "present barrier[] to expression." Dkt. 27 at 17. Even if that was the case, plaintiffs' reticence to express themselves so long as § 341.145(8) remains good law is the kind of self-imposed restriction that does not confer standing. *Clapper*, 568 U.S. at 416 ("[Parties] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). Plaintiffs also argue

that that the Department's denial of the "RD RRAGE" plate "creates a credible threat of enforcement" of and a "substantial risk that harm will occur" under § 341.145(8). Dkt. 27 at 18. But the Department's refusal to issue a personalized license plate in the first place negates the threat of that plate being revoked in the future. The Department cannot revoke and order returned a license plate it never issued. Plaintiffs have not offered any evidence to suggest they are facing a credible, imminent threat of having an issued license plate revoked under § 341.145(8), and so the court finds that they do not have standing to challenge that subsection of the statute.

Plaintiffs alternatively argue that "Wis. Stat. §§ 341.145(7) & (8) form an inseparable statutory scheme [that] cannot be reviewed separately." Dkt. 27 at 18. Defendant retorts that plaintiffs' characterization of the sections as inseparable is unsupported by any authority and the fact that both subsections incorporate the same challenged language does not make them inherently inseparable. Dkt. 32 at 19.

These arguments touch on the severability of the two subsections, which is a question the court would be forced to answer if it found one of the two unconstitutional. As explained next, the court does not make that finding, so the question of severability as a remedy is moot. But to the extent the parties rely on concepts of severability to bolster their standing arguments, the court addresses those points now. Whether provisions of a state law can be severed from the whole to preserve the rest is a question of state law. *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 804 (7th Cir. 1999). Wisconsin law provides that "the provisions of the statutes are severable," and that "if any provision of the statutes . . . is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or

13

Case: 3:24-cv-00566-amb   Document #: 35   Filed: 12/12/25   Page 14 of 19

application." Wis. Stat. § 990.001(11).  Subsection (8) could be given effect in the absence of subsection (7) because the Department could conceivably exercise no oversight over the application process but could still retain the ability to recall and cancel a plate.  So, even viewed from this different vantage point, the court cannot find plaintiffs have standing to challenge subsection (8).

Because the court finds that plaintiffs do not have standing to challenge subsection (8), the court dismisses plaintiffs' challenge to Wis. Stat. § 341.145(8) on that basis.  But even if the court had found standing to challenge both subsections, the ultimate conclusion reached below regarding subsection (7) would apply with equal force to subsection (8), warranting judgment in defendant's favor on this alternative basis.

    **2.  Government or private speech**

The court now turns to the merits of the constitutional challenge and the threshold question of whether the text forming the registration numbers of Wisconsin's personalized plates is government speech.  The parties agree that the three *Walker* factors are the appropriate framework through which to analyze the issue, *i.e.*, (1) whether governments have historically used the text to speak to the public, (2) the general public's perception of who speaks through that text, and (3) whether the government maintains control over the text.  Applying this framework, the court concludes that the text is government speech.

    **a.  The history of the expression**

Wisconsin's state-issued license plates convey government information through their registration numbers and have done so since their inception.  The state stamps unique combinations of numbers and letters on every license plate to identify vehicles and link them to their owners.  This is why the state dictates that all license plates must be displayed and

legible, and that no plate, including personalized ones, may have the same combination of characters as any other currently issued plate. *See* Wis. Stats. §§ 341.145(2)(c) & 341.15(2). In short, the text on license plates, personalized or otherwise, falls into the category of speech that the *Walker* court identified as "essentially government IDs." *Walker*, 576 U.S. at 212. While the personalized plate program allows drivers to request a particular combination of characters, that does not defeat the ultimate purpose of the text as a unique identifier for a vehicle and thus does not convert the text into a different form of speech. *See Odquina v. City & Cnty. of Honolulu*, No. 22-CV-407-DKW-RT, 2022 WL 16715714, at *9 (D. Haw. Nov. 4, 2022), *aff'd*, No. 22-16844, 2023 WL 4234232 (9th Cir. June 28, 2023).

Plaintiffs argue that this finding condemns the state to "babbling prodigiously and incoherently" through the thousands of disparate and potentially conflicting messages on personalized plates. Dkt. 18 at 11 (quoting *Tam* 582 U.S. at 219). Certainly, the personalized plate program permits a wide array of messages to appear on Wisconsin-registered vehicles, including some that are arguably opposed, such as "GO PACK" and "GO BEARS." While this might appear inconsistent on a surface level, it is harmonious with the text's primary purpose as a means of identifying and indexing cars. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001) ("even dry information, devoid of advocacy, political relevance, or artistic expression" has been considered speech under the First Amendment). Thus, because "GO PACK" and "GO BEARS" are unique from each other, both combinations satisfy and are consistent with the state's ends. Any incidental benefit to an applicant who managed to personally express an idea through a personalized plate, as plaintiffs argue they did, does not supersede that essential government purpose or render the scheme incoherent.

This ultimate purpose distinguishes license plates from trademarks, which primarily promote brands to consumers. *Tam*, 582 U.S. at 224. As the Court noted in *Tam*, "[c]ompanies spend huge amounts to create and publicize trademarks that convey a message." *Id.* at 239. There is no like corollary with the text of personalized plates. More fundamentally, trademarks predate the United States and may exist and be enforced at common law without being registered by the government. *Id.* at 224. Not so with license plates, whose origins and existence derive entirely from state statutes and regulations.

### b. The public's perception

The sheer number of license plates allows for the reasonable conclusion that the public understands license plates and their registration numbers come from the state and convey governmental information. There were more than six million vehicles registered in Wisconsin in 2024. *See* Dkt. 26-9 at 93. There are hundreds of thousands of personalized plates currently registered in the state, and the Department received tens of thousands of personalized plate applications each of the previous three years. So a substantial number of Wisconsinites have firsthand knowledge of the Department's role in reviewing, approving, and issuing personalized plates specifically. *See id.* at 84–85. Indeed, the *Walker* Court noted that "a person who displays a message on a . . . license plate likely intends to convey to the public that the State has endorsed that message." *Walker*, 576 U.S. at 212. By contrast, as the Court also observed in *Walker*, bumper stickers are the obvious medium by which motorists may broadcast purely personal messages from their vehicles without any governmental oversight. *Id.*

Plaintiffs assert that "personalized registration plate configurations . . . are identified with the plate holder," offering as evidence only their belief that it would be "ridiculous to think that the State of Wisconsin is declaring itself a fan of the Chicago Bears" by approving a

16

"BEARS" vanity plate. Dkt. 18 at 9. Beyond lacking any evidentiary support, plaintiffs' argument relies on a reductive interpretation of the second *Walker* factor. The court concedes that plaintiffs' proffered scenario would in fact be ridiculous. But the court is also not so cynical of the general public's capacity for nuanced thought. A reasonable person can understand that the state acquiesced to a resident's request to identify their vehicle by the word "BEARS" without also interpreting it as the sovereign State of Wisconsin's official announcement of its favorite sports team.

### c. The government's control over the expression

The Department's exercise of control over the personalized plate program is virtually identical to that which persuaded the Court to hold for Texas in *Walker*. Just like the state Board in *Walker*, the Department here reviews every personalized plate application and must approve each before it is issued. And, as in *Walker*, the Department routinely exercises its authority, denying 694 applications in 2024 alone. Dkt. 33 at 7. This stands in sharp contrast to the complete lack of oversight or screening Boston exercised in *Shurtleff*, which was central to the Court's finding of private speech in that case. *See Shurtleff*, 596 U.S. at 257 ("In *Walker*, a state board 'maintain[ed] direct control' over license plate designs by 'actively' reviewing every proposal and rejecting at least a dozen. Boston has no comparable record.") (internal citation omitted).

Plaintiffs are adamant that Wisconsin does not exercise control over its personalized plate program "to nearly the extent" that Texas did because Wisconsin does not "design, develop, or meaningfully endorse" the text on approved personalized plates. Dkt. 18 at 12. To be sure, Texas's specialty plate program differs from Wisconsin's personalized plate program in certain ways. Most notably, Texas law permits its legislature to specifically call for the

17

development of a specialty license plate to promote state sponsored policies, such as plates stating, "Keep Texas Beautiful." *Walker*, 576 U.S. 200. As far as the court is aware, there is no analogous route through which the State of Wisconsin may call for the creation of a specific personalized plate.

But these distinctions do not dictate a different result. Although Texas law permits the state to engage in its own design process, that was not relevant to the Court's analysis in *Walker*, which dealt with a design submitted by a private party, like plaintiffs' plate application here. But more importantly, *Walker* and *Shurtleff* clarify that the state's exercise of its own creative vision is unnecessary to find the state possesses effective control over the expression. Rather, those cases reveal that the meaningfulness of the state's oversight and its exercise of veto power are paramount. Plaintiffs contend that the Department's "veto power should not transform the private messages . . . into messages of the state." Dkt. 18 at 12. But that sentiment is an argument against the Supreme Court's holdings in *Summum*, *Walker*, *Tam*, and *Shurtleff*—not one this court is at liberty to credit.

This analysis leads the court to conclude that the text on personalized Wisconsin registration plates is government speech. Accordingly, plaintiffs' Free Speech claim under the First Amendment is inapplicable as a matter of law.

CONCLUSION

A thorough review of *Summum*, *Walker*, and their progeny convince the court that the text on Wisconsin's personalized license plates constitutes government speech. Consequently, plaintiffs' First Amendment Free Speech violation claim is inapplicable as a matter of law. Because plaintiffs' sole claim is inapplicable as a matter of law, the court will not consider their

argument that Wis. Stat. § 341.145(7) facially violates the First Amendment. The court thus GRANTS defendant's motion for summary judgment, Dkt. 22, and DENIES plaintiffs' motion, Dkt. 18.

ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment, Dkt. 22, is GRANTED.

2. Plaintiffs' motion for summary judgment, Dkt. 17, is DENIED.

3. The clerk of court is directed to enter judgment for the defendant and to close this case.

Entered December 12, 2025.

                                          BY THE COURT:

                                          /s/
                                          _____
                                          ANITA MARIE BOOR
                                          Magistrate Judge